UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MICHELLE SKINNER,

        Plaintiff,

v.  Case No. 6:11-cv-1760-Orl-37KRS

LEGAL ADVOCACY CENTER OF
CENTRAL FLORIDA, INC.; and
COMMUNITY LEGAL SERVICES OF
MID-FLORIDA, INC.,

        Defendants.

## ORDER

This cause is before the Court on the following:

1. Defendant Legal Advocacy Center of Central Florida, Inc.'s Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 43), filed May 31, 2013;

2. Community Legal Services of Mid Florida's Motion for Summary Final Judgment and Memorandum of Law in Support (Doc. 45), filed May 31, 2013;

3. Plaintiff's Memorandum of Law in Opposition to Defendants' Motion[s] for Summary Judgment (Doc. 49), filed June 13, 2013; and

4. Defendant Legal Advocacy Center of Central Florida, Inc.'s Reply to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion[s] for Summary Judgment (Doc. 51), filed June 27, 2013.

Upon consideration, the Court finds that Defendants' motions for summary judgment are due to be granted, for the reasons set forth below.

## BACKGROUND[1]

Plaintiff alleges that she was previously employed as a staff attorney by Defendants Legal Advocacy Center of Central Florida ("LACCF") and Community Legal Services of Mid-Florida ("CLSMF"). (Doc. 1, ¶¶ 2–5.) Plaintiff avers that due to a frayed relationship with her former legal assistant and a generally hostile work environment, she became ill and took medical leave, which she believed to be pursuant to the Family and Medical Leave Act ("FMLA"). (*Id.* ¶¶ 7–11; *see also* Doc. 44-1, Skinner Dep. 113:12–14.) She contends that when she returned from leave, she was retaliated against for exercising her FMLA rights and then terminated by her LACCF supervisor Mary Raspet. (Doc. 1, ¶¶ 13–18.)

Plaintiff subsequently brought this suit, alleging FMLA retaliation.[2] (*Id.* ¶ 1.) LACCF and CLSMF have each moved for summary judgment, arguing that LACCF was Plaintiff's sole employer and that her claim must therefore fail because LACCF has too few employees to fall within the purview of the FMLA. (Docs. 43, 45.) In response, Plaintiff contends that LACCF and CLSMF should be deemed a single "integrated" employer, with enough employees in the aggregate to qualify for the FMLA. (Doc. 49, pp. 3–5.) Plaintiff further argues that even if she was not technically FMLA-eligible, LACCF held itself out as an FMLA-eligible employer, such that it should now be estopped from arguing that Plaintiff was not entitled to FMLA leave. (*Id.* at 5–7.) This matter is now ripe for the Court's adjudication.

---

[1] The following factual allegations, derived from the record, are construed in the light most favorable to Plaintiff; the actual facts of the case may be different from those stated here. *See Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002).

[2] Plaintiff is not claiming FMLA interference, race discrimination, or Title VII retaliation in this suit. (*See* Doc. 44-2, Skinner Dep. 169:11–23, 205:18–206:22.)

2

**STANDARDS**

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A movant carries his burden by showing that there is an absence of evidence supporting the non-movant's case. *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001). The burden then shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show a genuine issue for trial. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).

A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict" for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Which facts are material depends on the underlying substantive law. *Id.* The Court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the non-movant. *Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006). However, "an inference based on speculation and conjecture is not reasonable." *Blackston v. Shook & Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir. 1985) (citations omitted).

**DISCUSSION**

I.  **Integrated Employer**

LACCF argues that Plaintiff is not an "eligible employee" within the meaning of the FMLA because that definition excludes those who work for employers that employ less than fifty workers at that worksite. 29 U.S.C. § 2611(2)(B)(ii); *see also* 29 C.F.R. § 825.104(a) (noting that to be considered a "covered employer" within the meaning of the FMLA, an employer must employ at least fifty workers). It is undisputed that LACCF employs less than fifty workers. (*See* Doc. 46-4, Endsley Aff. ¶ 6 (stating that LACCF

had four to eight employees); Doc. 43-1, Raspet Aff. ¶ 7 (noting that LACCF never employed more than eleven people during Plaintiff's employment).)

However, Plaintiff submits that LACCF and CLSMF should be considered a single "integrated" employer, such that their employees should be aggregated to meet the fifty-employee requirement. (Doc. 49, pp. 3–5; *see* Doc. 45, p. 6 (stating that CLSMF has eighty employees).) Multiple entities may be deemed a single "integrated" employer based on a totality of the circumstances test, with relevant factors including: "(i) Common management; (ii) Interrelation between operations; (iii) Centralized control of labor relations; and (iv) Degree of common ownership/financial control."[3] 29 C.F.R. § 825.104(c)(2); *see also Morrison v. Magic Carpet Aviation*, 383 F.3d 1253, 1257 (11th Cir. 2004) (applying the four-factor test).

### A. Common Management

Under this factor, the Court looks to who controls the daily operations and who has hiring and firing authority. *See Cruz-Lovo v. Ryder Sys., Inc.*, 298 F. Supp. 2d 1248, 1253 (S.D. Fla.), *aff'd*, No. 03-11247, 2003 WL 23150113, at *1 (11th Cir. Nov. 5, 2003) (per curiam) (citing *Hukill v. Auto Care, Inc.*, 192 F.3d 437, 443 (4th Cir. 1999), *abrogated on other grounds by Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006)).

Plaintiff states that LACCF and CLSMF share the same board of directors. (Doc. 44-1, Skinner Dep. 83:16–20.) Defendants state that they technically have separate boards, but admit that the members on each board are coextensive.

---

[3] Plaintiff argues solely that LACCF and CLSMF should be considered an "integrated employer" pursuant to 29 C.F.R. § 825.104(c)(2). (Doc. 49, pp. 3–5.) There is another theory under which multiple entities may be deemed a single employer: the "joint employer" theory pursuant to 29 C.F.R. § 825.106. *See also Cruz-Lovo v. Ryder Sys., Inc.*, 298 F. Supp. 2d 1248, 1255–59 (S.D. Fla. 2003) (applying the § 825.106 test). However, because Plaintiff did not raise that argument in opposition, the Court considers it waived.

(Doc. 43-1, Raspet Aff. ¶ 6; Doc. 46-5, Abbuehl Aff. ¶ 10.)

Mary Raspet, Plaintiff's supervisor and the Advocacy Director of LACCF, avers that CLSMF did not have hiring or firing authority over LACCF employees. (Doc. 43-1, Raspet Aff. ¶ 6.) Plaintiff, however, believes that CLSMF management had some sort of control over Raspet's decisionmaking. (Doc. 44-1, Skinner Dep. 80:16–20 ("I want to say that maybe Mary told me that at some point they do discuss with the Executive Board at CLSMF when they're making their new hires."), 81:12–14 ("I kind of got the feeling that, you know, there was some other rubber-stamping that needed to go through some other places."), 92:9–14 (stating that Plaintiff believed that Raspet had to go through CLSMF management to approve Plaintiff's raise).)

Bob Endsley, a CLSMF employee who handled LACCF's human relations ("HR"), was present when Raspet terminated Plaintiff; however, it is undisputed that Raspet did all the talking and that Endsley was only a silent witness. (Doc. 46-4, Endsley Aff. ¶¶ 7–11; Doc. 44-1, Skinner Dep. 139:25–140:2.) Though LACCF asserts that Raspet had the ultimate responsibility for implementing its termination policy, it also acknowledges that Endsley was responsible for giving Raspet guidance on the policy's application. (Doc. 43-1, Raspet Aff. ¶ 10; *id.* at pp. 17–21.)

It is undisputed that Raspet was Plaintiff's direct supervisor throughout her employment. (Doc. 43-1, Raspet Aff. ¶ 11; Doc. 44-1, Skinner Dep. 98:11–14.) Plaintiff asserts, though, that Raspet reported—in some fashion—to Bill Abbuehl, the Executive Director of CLSMF, and his second-in-command Glenn Shuman. (Doc. 44-1, Skinner Dep. 98:15–99:18 (stating that Abbuehl was the "power behind the throne"), 102:8–13 ("I didn't say [Shuman] was her direct Supervisor, but maybe . . . she had some type of reporting or some type of subordinate position to him.").) She also avers that CLSMF

5

management "forced" LACCF and Raspet to take certain cases. (*Id.* at 100:1–102:13 (stating that Raspet was "subordinate" to CLSMF management).)

Thus, there are factual disputes as to who controlled daily operations and who had hiring and firing authority at LACCF. Because the Court must construe the facts in the light most favorable to Plaintiff, this factor cuts in Plaintiff's favor.

### B.   Interrelation of Operations

Under this factor, the Court looks to the companies' office space, boards of directors' meetings, banking operations, and purchases. *See Hukill*, 192 F.3d at 443. Importantly, however, the fact that one company purchases administrative services from the other "is of no consequence." *Id.*; *see also Cruz-Lovo*, 298 F. Supp. 2d at 1253 (noting that purchasing administrative services is not dispositive).

LACCF asserts that it and CLSMF are "separate corporations with separate boards of directors, management, staff, facilities, bank accounts, trust accounts, litigation accounts, unemployment compensation accounts, websites, budgets and policies." (Doc. 43-1, Raspet Aff. ¶ 6.) It argues that the relationship between the two companies is limited to the Support Services Contract, through which LACCF purchased from CLSMF: "personnel, accounting, information technology and other support services"; "maintenance of personnel files and policies, payroll services, calculation of leave and the administration of certain employee benefits"; and "[office] maintenance services." (*Id.* ¶ 5; *see also* Doc. 46-2, pp. 6–11.)

The companies' operations appear to have been interrelated in a few other ways beyond the administrative services contract. For instance, the companies operated out of the same building for a time (Doc. 44-1, Skinner Dep. 52:21–53:16, 54:6–20), and CLSMF and LACCF staff were mixed together in the same building (*id.* at 54:12–20

6

(noting that LACCF and CLSMF staff were on the same floor, though LACCF attorneys were on a separate floor)). There is also a dispute as to whether the boards of directors' meetings were separate. (*Id.* at 83:16–20 (stating that Plaintiff attended a board meeting and believed that the companies had the same board); Doc. 43-1, Raspet Aff. ¶ 6; Doc. 46-5, Abbuehl Aff. ¶ 10.) Plaintiff also used CLSMF's offices when traveling for work; for example, she used their conference room, computer, and interpreter when she traveled to Kissimmee to meet with a client. (Doc. 44-1, Skinner Dep. 61:20–63:4, 65:2–14, 71:11–73:5.)

Ultimately, the bulk of the relationship between LACCF and CLSMF appears to be defined by the Support Services Contract, which cuts strongly in favor of Defendants because such a contractual relationship is inapposite to this factor. However, there are a few other interrelated operations that cut in favor of Plaintiff, such as shared office space, shared board meetings, and the fact that she used CLSMF services when traveling. Thus, the Court considers this factor to be largely neutral (if not slightly tilted in Defendants' favor).

### C.    Centralized Control of Labor Relations

Under this factor, the Court looks to supervisory authority and the power to control employees' work schedules. *See Hukill*, 192 F.3d at 444; *Cruz-Lovo*, 298 F. Supp. 2d at 1254. One company's use of the other's HR services is not sufficient to satisfy this factor. *Cruz-Lovo*, 298 F. Supp. 2d at 1254. The fact that an employee of one company is asked to attend orientation at the other company is similarly insufficient. *Morrison*, 383 F.3d at 1257.

There is very little evidence that CLSMF had control over LACCF's labor relations. To begin with, CLSMF employees are unionized, but LACCF employees are

not. (Doc. 43-1, Raspet Aff. ¶ 6.) Further, though LACCF contracted with CLSMF for HR services (*id.* ¶ 7), this is irrelevant, as is the fact that Plaintiff attended training with CLSMF employees (Doc. 44-1, Skinner Dep. 67:9–11, 71:11–73:5). *See Cruz-Lovo*, 298 F. Supp. 2d at 1254; *Morrison*, 383 F.3d at 1257. It is also undisputed that Raspet was Plaintiff's supervisor, and when Plaintiff wanted to change her work schedule, she contacted Raspet, not anyone from CLSMF (*see, e.g.*, Doc. 46-3, p. 256). *Cf. Hukill*, 192 F.3d at 444 (noting that the power to control the work schedules of employees is relevant to this factor). All of these facts cut in favor of Defendants.

Plaintiff does point to one employee who was supposedly a "split" employee of both companies.[4] (Doc. 44-1, Skinner Dep. 26:1–8, 50:5–10, 105:8–10 (stating that Jeannette Hernandez, a legal assistant, "definitely was split with CLSMF").) Even taking this as true, however, the rest of the evidence on which Plaintiff relies does not show centralized control of labor relations. On balance, the Court finds that this factor favors Defendants.

### D. Common Ownership/Financial Control

Under this factor, the Court looks to who owns the companies. *See Hukill*, 192 F.3d at 444; *Cruz-Lovo*, 298 F. Supp. 2d at 1254; *Morrison*, 383 F.3d at 1257. The Court may also look to whether "the business enterprise was splintered into separate corporations . . . ." *Papa v. Katy Indus.*, 166 F.3d 937, 942 (7th Cir. 1999).

Here, both LACCF and CLSMF receive funding from the Florida Bar Foundation. (Doc. 44-1, Skinner Dep. 88:3–17.) However, those funds are separate and are not commingled. (Doc. 43-1, Raspet Aff. ¶ 6.)

---

[4] Plaintiff also notes that CLSMF paralegal Bruce Scott attended LACCF meetings (Doc. 44-1, Skinner Dep. 104:4–106:9), though she does not aver that he was a joint employee with LACCF.

Significantly, CLSMF receives money from the Legal Services Corporation ("LSC"), but LACCF does not. (Doc. 44-1, Skinner Dep. 88:7–17.) This is particularly meaningful because LSC has strict restrictions on its funding; LSC-funded organizations cannot seek attorney's fees, participate in class actions, represent undocumented workers, lobby, or challenge administrative decisions. (Doc. 46-5, Abbuehl Aff. ¶ 8.) LSC-funded organizations must be legally separate from non-LSC-funded organizations. *See* 45 C.F.R. §§ 1610.1–.9 (noting that to be considered legally separate, the non-LSC-funded organization must be physically and financially separate, with separate personnel, accounting, facilities, and identification).[5]

An examination of the organizations' histories is helpful here. Prior to the formation of LACCF and CLSMF, three LSC-funded organizations existed in Central Florida: Central Florida Legal Services, Inc. ("CFLS"), Withlacoochee Area Legal Services ("WALS"), and Greater Orlando Area Legal Services ("GOALS"). (Doc. 46-5, Abbuehl Aff. ¶ 7.) Because LSC-funded organizations were statutorily limited in the types of work they could take, the heads of CFLS, WALS, and GOALS determined that they needed to create an independent, non-LSC-funded organization to do the "restricted" work. (*Id.* ¶ 9.) Therefore, CFLS and GOALS merged to become CLSMF, which continued to accept LSC funds and did not do restricted work; WALS became LACCF, which refused LSC funds and took the restricted work. (*Id.* ¶ 10.) After their formation, LSC completed a thorough on-site and documentary review of CLSMF and LACCF; LSC consequently determined that CLSMF is in compliance with LSC's funding restrictions and that LACCF is a legally and fiscally separate company. (*Id.* ¶ 11.)

---

[5] The Court grants CLSMF's unopposed request to take judicial notice of this regulation. (Doc. 42.)

While the Court does not consider LSC's labeling of LACCF as a financially separate company to be dispositive, it nevertheless weighs heavily in favor of Defendants. The fact that LACCF was descended from a different organization than CLSMF is also a point in Defendants' favor. *Cf. Papa v. Katy Indus.*, 166 F.3d at 942 (noting that the fact that the companies originated from different enterprises cut against a finding of integration). In short, Plaintiff has proffered nothing to convince the Court that LACCF and CLSMF are commonly owned.[6] Therefore, this factor cuts strongly in favor of Defendants.

In sum, two factors cut in favor of Defendants, one favors Plaintiff, and one is neutral (though tipped in Defendants' favor). Ultimately, considering the totality of the circumstances, the Court cannot say that LACCF and CLSMF are a single integrated employer, even construing the facts in the light most favorable to Plaintiff. The vast majority of the organizations' relationship is defined by the services contract between them, which is simply not enough to show integration. *See Cruz-Lovo*, 298 F. Supp. 2d at 1252–55 (finding no integration on similar facts). Thus, Plaintiff has not demonstrated that she is an eligible employee within the meaning of the FMLA. *See id.* at 1252 (noting that it is the plaintiff's threshold burden to demonstrate that she is FMLA-eligible).

## II. Estoppel

In the alternative, Plaintiff asks the Court to find that LACCF is estopped from arguing that she is not eligible for the FMLA. (Doc. 49, p. 5.) The U.S. Court of Appeals

---

[6] Plaintiff notes that her student loan repayment benefit paperwork had CLSMF's logo on it. (Doc. 44-1, Skinner Dep. 94:18–95:13.) However, this does not demonstrate common financial control, as the Support Services Contract gives control over the administration of benefits to CLSMF. (*See* Doc. 43-1, Raspet Aff. ¶ 5.) Further, when Plaintiff had an issue with her loan repayment benefits, she took it up with Raspet, not anyone at CLSMF. (Doc. 44-3, pp. 16–17.)

for the Eleventh Circuit has yet to adopt the estoppel doctrine in the FMLA context. *Martin v. Brevard Cnty. Pub. Sch.*, 543 F.3d 1261, 1266 (11th Cir. 2008) (explicitly noting that "we say nothing" as to the estoppel issue); *see also Dawkins v. Fulton Cnty. Gov't*, No. 12-11951, 2013 WL 5422977, at *3 (11th Cir. Sept. 30, 2013) (noting that it "need not decide at this time whether equitable estoppel should apply to the FMLA" because the plaintiff did not meet the detrimental reliance requirement). Further, Plaintiff could not point to any cases in which district courts within this circuit found that the doctrine applied. *See, e.g.*, *Pennant v. Convergys Corp.*, 368 F. Supp. 2d 1307, 1313 (S.D. Fla. 2005); *Hills v. Wal-Mart Stores, Inc.*, No. 08-23197-CIV, 2010 WL 1839268, at *8 (S.D. Fla. May 6, 2010); *Peery v. CSB Behavioral Health Sys.*, No. CV106-172, 2008 WL 4425364, at *13 (S.D. Ga. Sept. 30, 2008); *Moore v. Sears Roebuck & Co.*, No. 3:06cv255-RV/MD, 2007 WL 1950405, at *9 (N.D. Fla. July 2, 2007). *But see Gonzales v. Pasco Cnty. Bd. of Cnty. Comm'rs*, No. 8:11-cv-1397-T-30TGW, 2013 WL 179948, at *6 n.3 (M.D. Fla. Jan. 17, 2013) (suggesting that an FMLA plaintiff could "possibly" survive a summary judgment motion based on estoppel, but also noting that the Eleventh Circuit has not adopted the doctrine).

Nonetheless, Plaintiff asks the Court to look to the law of other circuits to estop Defendants from challenging her FMLA eligibility in this case. (*See* Doc. 49, pp. 5–7.) Indeed, it appears that all of the circuits that have addressed the issue have found that equitable estoppel is available in the FMLA context. *See, e.g.*, *Murphy v. FedEx Nat'l LTL, Inc.*, 618 F.3d 893, 899–900 (8th Cir. 2010); *Dobrowski v. Jay Dee Contractors, Inc.*, 571 F.3d 551, 554–57 (6th Cir. 2009); *Minard v. ITC Deltacom Commc'ns, Inc.*, 447 F.3d 352, 359 (5th Cir. 2006); *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725–27 (2d Cir. 2001); *see also Dormeyer v. Comerica Bank-Ill.*, 223

F.3d 579, 582 (7th Cir. 2000) (stating in dicta that estoppel "might" be available in the FMLA context); *cf. Dawkins*, 2013 WL 5422977, at *6 (Wilson, J., dissenting) (urging the Eleventh Circuit to clarify the state of the law and noting that "[a]ll of the other circuits to address the issue have concluded that the equitable estoppel doctrine applies in FMLA employment discrimination cases when its elements are met").

Assuming without deciding that equitable estoppel is available here, the Court is not convinced that Plaintiff has raised a genuine issue of material fact to survive summary judgment. The elements of equitable estoppel are:

> (1) the party to be estopped misrepresented material facts; (2) the party to be estopped was aware of the true facts; (3) the party to be estopped intended that the misrepresentation be acted on or had reason to believe the party asserting the estoppel would rely on it; (4) the party asserting the estoppel did not know, nor should it have known, the true facts; and (5) the party asserting the estoppel reasonably and detrimentally relied on the misrepresentation.

*Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1326 (11th Cir. 2008). Here, Plaintiff has not shown that she detrimentally relied on a misrepresentation by LACCF. *See Dawkins*, 2013 WL 5422977, at *4 ("To show detrimental reliance, the plaintiff must generally show that the defendant's actions caused her to change her position for the worse.").

No one at LACCF ever told Plaintiff that she was approved to take FMLA leave. (Doc. 44-1, Skinner Dep. 129:1–9 ("Q. . . . Did anyone at LACCF ever tell you that you were approved to take FMLA Leave? A. No.").) Plaintiff simply went to the doctor and then emailed Raspet to inform her that Plaintiff was going on "FMLA leave." (*Id.* at 128:9–25; Doc. 44-3, p. 47.) When Plaintiff was asked why she believed that the leave was FMLA leave, she replied that she "[p]robably" heard it from Diane Hart in HR. (Doc. 44-1, Skinner Dep. 129:16–18.) When pressed further, Plaintiff could not recall

specifically what Hart told her to make her think that. (*Id.* at 129:23–130:6.) Plaintiff never discussed taking leave with her LACCF supervisor. (*Id.* at 125:5–8.)

Rather, Plaintiff's own testimony demonstrates that she did not change her position in any way based on alleged misrepresentations by LACCF, if indeed there was any definite misrepresentation.[7] (*Id.* at 124:13–17, 129:1–130:6.) If Plaintiff did rely on some assertion by LACCF, there would be some indication of that reliance in the record—an inquiry as to her status, written request of approval to her supervisor, confirmation that she had worked enough hours to be eligible, documentation of forms sent to her doctor by LACCF, or testimony that she would not have taken the leave if she were informed that she was not protected by the FMLA. *See Dobrowski*, 571 F.3d at 557–58 ("Had [the plaintiff] relied on the erroneous representations, one would expect [the plaintiff] to be able to point to some action or statement that indicated that his decision to [take the leave] was contingent on his understanding of his FMLA status; or perhaps evidence that raises an inference of such contingency—for example, a record

---

[7] LACCF admits that it uses a form to request leave entitled "LACCF Form #1010 FMLA Leave Request." (Doc. 43-1, Raspet Aff. ¶ 9.) Plaintiff also viewed "certain documents . . . that you needed to fill out and send to HR if you were leaving on FMLA" sometime during her employment. (Doc. 44-1, Skinner Dep. 109:25–110:12.) While this may go toward establishing a misrepresentation, it is not dispositive because Plaintiff has not asserted that she relied on the form in taking the leave. (*See id.* at 129:16–18, 129:23–130:6.) Crucially, Plaintiff remembers very little about what forms were given to her doctor, by whom, or when. (*Id.* at 116:9–118:4, 122:1–125:4, 129:16–18.) She asserts that Hart "probably" faxed some documents to her doctor, though she does not specifically recall calling Hart or telling her to send a fax. (*Id.*) Plaintiff also does not recall whether she filled out any information on any forms, or whether any forms were sent back to her employer. (*Id.*) Further, Plaintiff has placed none of these relevant documents into the record. These vague assertions are not enough to show that there was even a definitive misrepresentation by LACCF, let alone that Plaintiff relied on it when she took her leave. *Cf. Dobrowski*, 571 F.3d at 557 ("To be sure, [the employer's] actions amount to a definite misrepresentation of his eligibility. He applied for leave on an FMLA form and received written notice from his company that his leave was 'pursuant to the Family and Medical Leave Act' and that he was an 'eligible employee' even though he was, in fact, not covered by the Act.").

13

that he made an inquiry as to his rights, asked for written confirmation of his leave arrangement, or changed his behavior after being told he was eligible." (citations and internal quotation marks omitted)). However, the record demonstrates the very opposite; Plaintiff's testimony makes clear that she went to the doctor and simply never returned to work, and would have done so regardless of her FMLA eligibility. (*See generally* Doc. 44-1, Skinner Dep. 109:25–131:9.)

In short, the nebulous, speculative tenor of Plaintiff's testimony is simply not enough to raise a genuine issue of fact as to whether she detrimentally relied on a misrepresentation by LACCF. *See Blackston*, 764 F.2d at 1482. One simply cannot detrimentally rely on FMLA approval that one has neither sought nor been given. *Cf. Minard*, 447 F.3d at 354, 359 (finding triable issues of fact on misrepresentation and detrimental reliance where the plaintiff specifically sought and was actually granted FMLA leave). Thus, estoppel doctrine is not properly invoked here, even if it were available. Summary judgment is therefore due to be granted in favor of Defendants.

## CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1. Defendant Legal Advocacy Center of Central Florida, Inc.'s Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 43) and Community Legal Services of Mid Florida's Motion for Summary Final Judgment and Memorandum of Law in Support (Doc. 45) are **GRANTED**.

2. The Clerk is **DIRECTED** to enter judgment in favor of Defendants and against Plaintiff. Plaintiff shall take nothing on her claims. Defendants are awarded costs.

3. The Clerk is further **DIRECTED** to close this case. All pending deadlines

are **VACATED**.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on October 21, 2013.

ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record